JOHN W. LENNEY AND KATHERINE N. LENNEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87639. Filed May 18, 1962.

*M. B. Kambel, Esq.*, for the petitioners.
*David R. Brennan, Esq.*, for the respondent.

OPINION.

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the calendar year 1953 in the amount of $34,525.87.

Petitioners assign as error the following:

In determining the tax liability of petitioners for the calendar year 1953, the Commissioner erroneously converted a long-term capital gain realized from the sale by petitioners of a partnership interest, to ordinary income from the subject partnership.

The facts were stipulated and are so found.

Petitioners are husband and wife, residing in Riverside County, California. They filed a joint Federal income tax return for the calendar year 1953 with the district director of internal revenue for the Los Angeles, California, district.

In their return petitioner John W. Lenney, hereinafter sometimes referred to as Lenney, reported a long-term capital gain in the amount of $75,601.14 from the sale of his 50 percent partnership interest in Orange Gardens Unit #2, hereinafter sometimes referred to as the predecessor partnership. The gain comprised the selling price, $167,500, less the cost basis of the partnership interest, $91,298.86, less selling expense, $600. One-half of the gain, or $37,800.57, was taken into account in petitioners' return.

The respondent determined that the gain of $75,601.14 constituted ordinary income rather than long-term capital gain and, in a statement attached to the deficiency notice, explained his determination thus:

(a) It is determined that ordinary income of $75,601.74,[1] consisting of your distributable share of the profits, was realized from the sale of the assets of the partnership known as Orange Garden[2] Unit No. 2, rather than a long-term capital gain in that amount from the sale of the partnership interest reported in your return. Accordingly, ordinary income is increased in the amount of $75,601.74[1] and the long-term capital gain reported in the amount of $75,601.74[1] is eliminated.

(b) Long-term capital gain of $37,800.57 (50% of $75,601.74)[1] is eliminated

[1] The correct amount is $75,601.14.
[2] The correct name is Orange Gardens.

since the income from this source is included in item (a) above as ordinary income.

Lenney is a contractor, builder, and subdivider, and has been engaged in such business in Southern California for approximately the past 30 years.

The predecessor partnership was organized by a written "Agreement of Partnership" on September 15, 1952, between Lenney and Hugh Gibbs, an architect, to engage in the business of building and selling houses in Orange County, California. Each partner owned a 50 percent interest in the partnership.

In the organization of the partnership the partners contributed to the partnership, by way of partnership capital, cash for the purchase of land to be subdivided and of construction equipment for use in the subdivision work and erection of homes.

Land was purchased by the partnership in the city of Santa Ana, Orange County, California, and the land was subdivided into lots for the construction of 156 houses.

A construction loan was obtained by the partnership from the Bank of America in the total amount of $1,176,900. Pursuant to the agreement between the partnership and the Bank of America, 10 percent of the construction loan was to be released on the purchase of equipment and supplies, 20 percent on completion of the foundation, 20 percent on the completion of the roof and the wrapping of the building, 20 percent on completion of stucco, interior plaster, and cabinets, 20 percent on completion of the home and final approval of the Federal Housing Administration (FHA), and 10 percent within 30 days after completion of the homes.

Lenney took charge of and supervised the actual construction work, including the letting of all subcontracts and the purchase of all materials and services and labor. His partner designed and prepared plans for the subdivision and the individual houses, supervised almost all of the financial affairs of the partnership business, including the construction loan, and processed all matters involving the FHA and Veterans' Administration (VA) with respect to the qualification and approval of the subdivision by such agencies.

The partnership, by an agreement with the Bank of America dated January 29, 1953, agreed to buy all loans to be made by the Bank of America to purchasers of the homes built by the partnership. Before May 12, 1953, the partnership found a buyer who agreed to buy all of such loans, provided the individual home buyer met the qualifications of such buyer. With respect to approximately six of all of the loans made, additional information was required before they were accepted for purchase by such buyer, and correspondence between Lenney and Gibbs and the Bank of America relating thereto occurred on Novem-

ber 6, 1953, and December 23, 1953. The letter of November 6, 1953, signed by Gibbs alone, stated that he would buy from the Bank of America any loans rejected by the purchaser which had been found. A promise to buy such loans was also contained in letters to the Bank of America dated November 6, 1953, and April 23, 1954, and which were signed by Lenney, Gibbs, William M. Ryals, hereinafter sometimes referred to as William, and his wife, M. Gladwynne Ryals, hereinafter sometimes referred to as Gladwynne.

On May 12, 1953, Gibbs entered into an agreement which stated that he sells and conveys his 50 percent partnership interest to William M. Ryals, a real estate development investor and dealer, for the sum of $167,500. At the same time Lenney entered into an agreement with Gladwynne which stated that he sells and conveys his 50 percent partnership interest to her for the sum of $167,500. Both agreements were identical except for the names of the parties involved. The agreement between Lenney as seller and Gladwynne as buyer provided in part:

WHEREAS, Seller is a partner of Orange Gardens Unit #2, a partnership formed September 15, 1952 by and between Hugh Gibbs and J. W. Lenney; and

WHEREAS, Seller desires to sell all of his one-half interest in said partnership; and

WHEREAS, Seller has secured the consent of Hugh Gibbs to sell his entire partnership interest;

Now THEREFORE, the parties hereto agree as follows:

1. Seller hereby sells and transfers all of his one-half partnership interest in Orange Gardens Unit #2 to Buyer and Buyer hereby buys and accepts said partnership interest.

2. Buyer acknowledges and represents that the present partnership business is to be continued as a partnership, and in furtherance thereof that she and all other owners or purchasers of partnership interests intend to form a new partnership, hereinafter referred to as the "successor partnership", under the same name as the present partnership.

3. The purchase price which Buyer shall pay to Seller for Seller's partnership interest shall be $167,500.00. Upon the execution of this agreement Buyer shall pay to Seller the sum of $500.00, receipt of which is acknowledged by Seller, and deliver to Seller as security for the remainder (and not as payment thereof) a promissory note in the amount of $167,000.00 payable, without interest, on December 31, 1955 or in whole or in part at any time or times before said date, by Buyer out of her drawings from the successor partnership, as hereinafter provided.

4. In order to secure and provide for the payment by Buyer of the purchase price of the partnership interest hereunder, Buyer agrees that her share of surplus funds of the successor partnership shall be taken out as her partner's drawings when and as available and shall be applied in their entirety to payments to Seller on the purchase price of said partnership interest until it is paid for in full; provided however, that funds of the successor partnership shall be devoted first to the partnership business and that there shall not be withdrawn from the partnership any funds needed therein for the operation of the business thereof.

The adjusted basis of Lenney's partnership interest acquired prior to October 1952, on May 12, 1953, was $91,298.86.

In determining the purchase price of $167,500 to be paid under the above agreements dated May 12, 1953, an estimate was made of the profits to be derived on the sale of all of the homes, less the profit on the one home which was included in income by the predecessor partnership prior to the execution of such agreement. Applying such estimate, a price was determined which would give the buyers (the Ryals) an estimated $30,000 profit on their investment and activities.

On the day following the execution of the above agreements dated May 12, 1953, namely, on May 13, 1953, a "Liquidation Agreement" was made and entered into by and between the predecessor partnership in liquidation, Lenney and Gibbs, referred to as "First Parties" and the successor partnership, William and Gladwynne, referred to as "Second Parties." This agreement provided in part:

WHEREAS, ORANGE GARDENS UNIT #2 was a partnership formed September 15, 1952 by and between J. W. LENNEY and HUGH GIBBS; and

WHEREAS, J. W. LENNEY and HUGH GIBBS did yesterday sell and transfer to WILLIAM M. RYALS and M. GLADWYNNE RYALS all of their partnership interests in said ORANGE GARDENS UNIT #2, thereby dissolving said partnership; and

WHEREAS, WILLIAM M. RYALS and M. GLADWYNNE RYALS thereby became entitled to receive in liquidation from the dissolved partnership all the assets thereof subject to its liabilities; and

WHEREAS, WILLIAM M. RYALS and M. GLADWYNNE RYALS have this day formed, immediately prior to the execution of this agreement, a new partnership under the name of "ORANGE GARDENS UNIT #2"; and

WHEREAS, WILLIAM M. RYALS and M. GLADWYNNE RYALS desire to contribute to said new partnership all the assets and liabilities which they are entitled to receive in their individual capacities from the dissolved partnership by reason of their having purchased the partnership interests of J. W. LENNEY and HUGH GIBBS, and desire to thereafter continue by and through the new partnership as a successor partnership the business formerly conducted by the dissolved partnership;

\*　　\*　　\*　　\*　　\*　　\*　　\*

Now THEREFORE, in order to provide for and effect the immediate liquidation of the dissolved partnership ORANGE GARDENS UNIT #2, and to accomplish the orderly transfer to the successor partnership of all the assets and liabilities which WILLIAM M. RYALS and M. GLADWYNNE RYALS are entitled to receive in their individual capacities from and out of the liquidation of the dissolved partnership, the parties hereto do hereby mutually agree as follows:

1. First Parties, or any or all of them, shall forthwith execute and deliver all documents and instruments, and do any and all acts necessary or advisable in the premises to place as of record or show on any certificate or other indicium of ownership all transfers of or changes in title or rights to, or equity or ownership in, the assets of the dissolved partnership, all of which transfers or rights to receive transfer have arisen from the sale by J. W. LENNEY and HUGH GIBBS of their partnership interests in ORANGE GARDENS UNIT #2. \* \* \*

2. Second Parties and each of them, jointly and severally, hereby assume and agree to pay or otherwise discharge all liabilities and obligations of the dis-

solved partnership, as shown by its final statement of financial condition and/or by its books and records of account * * *

A summary of the assets and liabilities represented by the final statement of financial condition of the predecessor partnership at the time of sale of the partnership interests to William and Gladwynne on May 12, 1953, is as follows:

Assets:
| | | |
|---|---:|---:|
| Cash | $106, 121. 45 | |
| Construction loan proceeds receivable | 235, 915. 00 | |
| Other receivables | 2, 537. 14 | |
| Inventory of land and houses | 1, 018, 892. 86 | |
| | | $1, 363, 466. 45 |

Liabilities:
| | | |
|---|---:|---:|
| Accounts payable | 6, 960. 00 | |
| Bank of America construction loan | 1, 169, 300. 00 | |
| Accrued expenses | 4, 608. 74 | |
| | | 1, 180, 868. 74 |

| | |
|---|---:|
| Net assets—partners' capital | 182, 597. 71 |

The predecessor partnership adopted a fiscal year ended February 28 and filed its first partnership income tax return on Form 1065, on the accrual basis of accounting, for the period from inception of the partnership to February 28, 1953. The partnership operations for said taxable period resulted in a loss of $3,156.77, of which $1,578.38 was Lenney's share. The other income tax return filed by the predecessor partnership was its final return covering the period from March 1, 1953, to May 12, 1953. The partnership operations for the final taxable period resulted in a loss of $1,951.88, of which $975.94 was Lenney's distributive share. Petitioners reported in their individual income tax return for the year 1953 their shares of the losses of the partnership for both taxable periods. The losses were reflected in the adjusted basis of $91,298.86 for petitioners' partnership interest on May 12, 1953.

Except for minor details, all the houses had been completed by May 12, 1953.

The sales of the individual houses were handled by and through a real estate broker. In each case the broker and the purchaser executed a printed form of an agreement to purchase and sell, providing for approval and agreement to sell upon the part of the seller, for the terms of the sale, for the opening of an escrow at the Bank of America, and for prorations of taxes, rent, interest, and insurance to date of recording deed. Of the 155 houses included in inventory at May 12, 1953, such purchase and sale agreements had been signed up on 96, and escrows had been opened on 45 of these 96. No agreements to purchase and sell were in effect with respect to the remaining 59 houses. None of the houses was occupied on May 12, 1953. In the

selling out of the tract, the successor partnership executed the deeds of conveyance to the individual purchasers of all 155 houses, including the 45 which were in escrow on May 12, 1953. During the course of selling the lots of the tract, in the case of approximately 30 of the lots, agreements to purchase and sell first entered into were later canceled, and new purchasers had to be found.

A strike against the local power company occurred in May 1953 and lasted approximately 2½ weeks, thus delaying the installation of electric meters, connection of electric service, and the closing of some escrows.

The real estate broker handling the sales of the houses was retained by Lenney under an oral agreement. After retention, the broker dealt only with the Bank of America, who handled the sales escrows and from whom he received his commissions and, with one exception, had no contact with Lenney or his partner or the Ryals. On July 21, 1953, the broker assigned to Lenney his future commissions on the sales of houses in consideration of funds advanced by Lenney as advance payment of commissions.

The successor partnership of William and Gladwynne filed two partnership income tax returns, the first covering the period from May 13, 1953, to December 31, 1953, and the second and final return covering the period from January 1, 1954, to October 13, 1954. Such successor partnership realized a net income of $10,416.14 in said initial taxable period, and sustained a loss of $3,422.54 in its final period, resulting in a total net income of $6,993.60 for its approximately year and one-half of existence.

The parties have stipulated that:

The principal purpose of Lenney and Gibbs in entering into the agreements of May 12, 1953, was to have their Federal income tax reduced by having the principal portion of the profit estimated to be realized on the sale of all of the homes treated as long-term capital gain from the sale of a partnership interest rather than their share of the partnership's ordinary income from the sale of inventory.

There is nothing improper in such a purpose if in fact and in substance Lenney and Gibbs actually sold their partnership interests rather than the partnership assets. *Gregory* v. *Helvering*, 293 U.S. 465, 469; *Commissioner* v. *Tower*, 327 U.S. 280, 288; *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451. The agreements of May 12, 1953, must, however, be closely scrutinized for, as we said in *Paul W. Trousdale*, 16 T.C. 1056, affd. 219 F. 2d 563 (C.A. 9, 1955):

If, after considering all of the actualities, it is found to be but a subterfuge, it may then be disregarded for tax purposes. Substance will prevail over form. *Commissioner* v. *Tower, supra; Yiannias* v. *Commissioner*, 180 F. 2d 115.

We have carefully scrutinized all of the facts and have concluded that in substance as well as in form Lenney and Gibbs actually sold

their partnership interests rather than the partnership assets. There can be no question but that in form that is what was done and we do not understand the respondent to contend otherwise. As to substance, we think, for the reasons hereinafter stated, it coincided with the form.

At the time the contracts of May 12 and 13, 1953, were entered into, the partnership that had been formed by Lenney and Gibbs was an active, going concern. It was not a business in the liquidation stage. The 156 houses had been built but the sale of only one had been completed. The income from the sale of that house and lot was duly reported in the final return of the predecessor partnership for the period March 1 to May 12, 1953, in arriving at the net loss for that period of $1,951.88, one-half of which was duly reported in petitioners' joint return for 1953. Of the remaining 155 houses, no income had yet been realized. Purchasers had been found for 96 of the houses but escrows had been opened for only 45 of these 96, and no escrows had been closed and no purchasers had been found for the remaining 59 houses. As to these 155 houses, a great many things remained to be performed before taxable gain or loss could be determined or realized, and this activity fell upon the purchasers of the interests of the predecessor partnership and not upon Lenney and Gibbs. They had completely sold and parted with their partnership interests for a contract price of $335,000.

The factual situation here is entirely different from that in *Paul W. Trousdale, supra,* strongly relied upon by the respondent. The facts in that case show that the partnership there involved was solely a personal service partnership. Only $500 had been contributed by each of the two partners. Its business was that of supervising construction of housing projects for a fee per housing unit. It and its partners reported on the cash basis. The partnership had no employees. During the taxable year 1945 Trousdale wanted to retire from the partnership. At that time his proprietary interest in the partnership consisted of his investment of $500 and his one-half interest in fees *earned but uncollected* of $274,000, or a total proprietary interest of $137,500. He assigned this interest to others for $112,500, or at a discount of $25,000, and reported a long-term capital gain of $112,000. At the time of the assignment nothing remained to be done but to collect the fees for past services. The partnership was definitely in the liquidating stage. It was not an active, going concern. In affirming our holding that the $112,000 was taxable as ordinary income, the Ninth Circuit, among other things, said:

In short, we think that the Tax Court could properly find, as it did, that this was a case in which the transaction was not in substance and effect the sale of a partnership interest, but that the payments made to the petitioner were merely payments made to a retiring partner which represented his distributive share of earnings for past services.

It is apparent that the *Trousdale* case has no bearing upon the bona fide, arm's-length sale by Lenney and Gibbs of their partnership interests in Orange Gardens Unit #2. This was not a partnership engaged in the mere rendering of personal services. It was formed to acquire land, erect houses, and sell them. Each phase was a major undertaking. Substantial capital, both invested and borrowed, was required. Residential properties were created at a cost of over a million dollars. However, that was not the culmination of the partnership's business; it was equally essential and important that the houses be sold, and not until they were completely disposed of could the business be said to be in a state of liquidation where nothing remained but to collect the balance of the accounts. Such was not the status of the predecessor partnership on May 12, 1953. The partnership was an active, going concern with assets and liabilities each aggregating over a million dollars. We hold, therefore, that the agreements of May 12, 1953, constituted bona fide, arm's-length sales of partnership interests.

The law is now well settled that a bona fide sale of a partnership interest is taxable under section 117 of the 1939 Code at capital gains rates. *Joseph Pursglove, Jr.*, 20 T.C. 68, 72; *United States* v. *Shapiro*, 178 F. 2d 459 (C.A. 8, 1949), and cases therein cited; G.C.M. 26379, 1950–1 C.B. 58, and cases therein cited; *United States* v. *Snow*, 223 F. 2d 103 (C.A. 9, 1955). The Ninth Circuit in the *Snow* case said:

It is now the overwhelming weight of authority and the law of this circuit that an interest in a partnership is a capital asset.[2] The interest of John Snow *in the partnership* (as contrasted with partnership earnings) was held for more than six months and therefore qualifies for capital gains treatment under Section 117 of the Internal Revenue Code. [Footnote 2 omitted.]

In the instant case the interest of Lenney in the predecessor partnership "(as contrasted with partnership earnings)" was held for more than 6 months prior to May 12, 1953. As we have already indicated, there were no partnership earnings at the time the agreement with Gladwynne was entered into except the profit from the one house and that profit was reflected in the final return filed by the predecessor partnership.

Petitioners cite *Berry* v. *United States*, 267 F. 2d 298 (C.A. 6, 1959), as a case in point. In that case a partnership was formed on March 11, 1952, by Walter L. Berry and his associates and a certain construction company to perform a certain construction project on a completed-contract basis. On February 21, 1953, Berry and his associates sold their interest in the partnership to the other partner (the construction company) in consideration for the return of their investment and $75,000. Berry's share of the $75,000 was $56,250. At that time the construction project was approximately 76.5 percent completed. The remaining partner completed the project by December 28, 1953. Berry,

in 1953, reported the $56,250 as a long-term capital gain. The Government claimed the $56,250 was taxable as ordinary income. In agreeing with Berry, the Sixth Circuit, among other things, said:

It is settled law in this Circuit that * * * the sale of a partnership interest in a *going concern* is not the sale of the assets of the partnership but is to be treated as the sale of a capital asset. * * *

The rulings in some of those cases, however, turn upon the fact that at the time of the sale of the partnership interest a portion of the selling price was charged to the selling partner as income because *at the time of sale it was earned income by the partnership, definitely ascertained in amount and not contingent upon the happening of future events.* Income already earned by the partnership, to which the selling partner was legally entitled to his partnership share, was not changed into a capital asset by the sale.

The situation in the present case is quite different. The partnership agreement provided for a distribution of profits to the partners on the "completed contract" basis after it was determined whether the complete performance resulted in a profit or a loss. *At the time of the sale of the partnership interest, the construction contract was only approximately 76.5% completed. Many uncertainties still existed which could have a decisive effect upon the ultimate result* of whether upon the final completion of the contract the partnership would derive therefrom net income or suffer a loss. * * * We find no basis for the determination by the Commissioner that at that time the taxpayer and his associates had earned $75,000 profit or income from the incompleted construction project and it is accordingly rejected.

[Emphasis supplied.]

We agree with petitioners that the *Berry* case is in point and involves substantially the same principles as are involved in the instant case.

In his brief the respondent also takes the position,[1] apparently in the alternative, that the partnership created by Lenney and Gibbs continued in a state of liquidation after May 12, 1953; that it was not dissolved as a result of the contract of May 12, 1953; that the so-called sale of partnership interests was nothing but a sham; and that, in substance, what occurred was that the Ryals merely presided over the liquidation of the Lenney-Gibbs partnership for an estimated fee of $30,000. If the respondent is correct in such a position, which we do not think he is, then it is apparent that even on that basis there could be no deficiency in this proceeding for the reason that any profit made during the period March 1, 1953, to February 28,

---

[1] The position is stated in his brief thus:

"In effect, after May 12, 1953, the Lenney and Gibbs partnership was in a state of liquidation. The so-called 'sale' and 'assignment' of 'partnership interests' to Mr. and Mrs. Ryals was not a bona fide sale of an interest in a going business but a transaction designed to avoid the payment of income taxes. The transaction from beginning to end was nothing but a sham. * * * It is clear that the Ryals did not acquire a going business but merely presided over the liquidation of such a business for an estimated fee; such fee being determined on the basis of the amount of estimated profits to be derived on the sale of all of the homes and being paid via a sale to Ryals for a $30,000 discount of such amount."

296

1954, would be reported in the partnership's return for that fiscal year and would not be taken up by Lenney under section 706, I.R.C. 1954,[2] until the calendar year 1954, which year is not before us. Under this approach all that would be reportable in petitioners' joint return for the calendar year 1953 would be Lenney's share of the partnership loss of $3,156.77 for the fiscal year ended February 28, 1953.

We hold that the gain realized by Lenney on the sale and transfer on May 12, 1953, was a long-term capital gain from the sale of a partnership interest and not ordinary income from the sale and transfer of partnership assets.

*Decision will be entered for the petitioners.*

[2] SEC. 706. TAXABLE YEARS OF PARTNER AND PARTNERSHIP.

(a) YEAR IN WHICH PARTNERSHIP INCOME IS INCLUDIBLE.—In computing the taxable income of a partner for a taxable year, the inclusions required by section 702 and section 707(c) with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership *for any taxable year of the partnership ending within* or with *the taxable year of the partner.* [Emphasis supplied.]